# EXHIBITS N, O and P

RECEIVED
JUL 19 2005
HUTTON & HUTTON

# In the United States Court of Federal Claims

EXHIBIT
N

Case No. 04-1514L
(Filed: July 14, 2005)

******************************************************

KELLY DONHAM and VOTH OIL COMPANY, INC., individually and on behalf of all others similarly situated,
*Plaintiffs,*

v.

THE UNITED STATES OF AMERICA,
*Defendant.*

******************************************************

## ORDER

On April 15, 2005, the **Plaintiffs filed a Motion for Class Certification**, pursuant to U.S. Court of Federal Claims Rule 23, specifying:

> all property owners with fee simple title to the land underlying the railroad right-of-way along a 15-mile stretch of the Atchison, Topeka and Santa Fe Railroad line from milepost 4.53 (at Hoover Road, Wichita, Sedgwick County, Kansas) to milepost 19.50 (at 295th St. West, Garden Plain, Sedgwick County, Kansas).

The Defendant does not oppose this Motion and apparently concedes that class action litigation of these claims is appropriate under *Quinault Allottee Ass'n v. United States*, 453 F.2d 1272 (1974), and will serve the interests of justice. Pursuant to Rule 23 (c), the Court hereby determines that this action shall be maintained as a class action. The Court will revisit the need for a class action if necessary.

The parties shall ensure that proper notice under the provisions of Rule 23 (c)(2) is provided all members of the class. Counsel shall agree upon the deadline for opting-in and the content of the notice. No later than July 27, 2005, the parties are to supply the Court with a copy of the agreed upon notification and file a Joint Status Report proposing a schedule for further proceedings.

IT IS SO ORDERED.

LAWRENCE M. BASKIR
Judge

EXHIBIT
tabbles'
O



**C**

Supreme Court of Kansas.
KANSAS CENT. RY. CO.
v.
WILLIAM A. ALLEN.

January Term, 1879.

West Headnotes

**Eminent Domain ⚿198(2)**
148k198(2)
Whether the necessities of the railroad company require occupancy of the condemned land, exclusive of all uses by the owner of the fee, is a question of fact, and not of law.

**Eminent Domain ⚿317(2)**
148k317(2)
A railway company which condemns lands acquires only a right to the perpetual use thereof for railway purposes; the fee of the land remaining in the owner.

**Eminent Domain ⚿319**
148k319
A railroad has the paramount title to land taken under condemnation proceedings, and the landowner must yield to the superior right secured by such proceedings and cannot in any mode or for any purpose interfere with the use of the property so taken for railroad purposes.

*1 Error from Jefferson district court.

In June, 1877, the Kansas Central Railway Company made written application to the judge of the district court of Jackson county for the appointment of commissioners to make the appraisement and assessment of damages of a right of way for its road through that county. The commissioners were appointed, and subsequently made and filed their report in the office of the county clerk. The line of the proposed route for the railroad was through the S. E. 1/4 and the E. 1/2 of the S. W. 1/4 of section 25, township 6, range 14, being the lands of William A. Allen. The land appropriated for the right of way was one hundred feet in width, and the damages were assessed at $220.75. From this assessment of damages Allen appealed to the district court of Jackson county. Upon motion of the plaintiff in error, a change of venue was granted, and the case was ordered to be tried in Jefferson county. The case was heard at the June term, 1877, of the district court. The jury assessed the damage of the defendant in error at $500, and judgment was rendered accordingly for that sum in his favor. The railway company brings the case here for review.

*E. Stillings* and *Keeler & Gephart,* for plaintiff in error.

The main and most important question in this case, and that of the railway company against Ireland, is the extent of the right acquired by a railway company in the strip of land taken for a highway by compulsory proceedings through occupied and improved farms. The instruction complained of in the Case of Ireland goes to the extent of forbidding the farmer and his stock from passing from one part of his farm to the other *under* the railroad, in the bed of a stream, so deep below the railroad bridge that loaded teams could readily pass under the bridge, without any kind of obstruction to the railway. The same point is substantially before the court in the Allen Case; for in that case the bridge of the railroad was so high in places as to allow the free passage of stock, and with but little preparation to allow a roadway so far below the railway as to be no kind of obstruction to it. Has our legislature given or intended to give any such monopoly and arbitrary right to railway companies? If so, it is time it should be known; for we think we may safely assert the proposition that, if the uniform custom from the commencement of the railway construction in this state to the present time can throw any light upon the question, or tend to give construction to the statute, the instructions given in these cases are not the law of the state. In the Case of Allen, the proof showed that he was and had been in the use of the very privilege which this instruction required the jury to give him damages for being deprived of. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

statute gives the railway company the perpetual right to the strip of land for the use of the railroad. Dass. St. 1876, p. 174, § 84. Wherever the railway passes through an inclosure, the company must make cattle-guards where the road enters and where it leaves the inclosure. Laws 1869, c. 81, § 1. The inclosure is thus kept an entirety the same as before; and yet we are told by this instruction that it is the right of the railway company to exclude the occupant and his stock from passing under or over the road, without regard to the question whether such crossing may be effected without detriment to the use of the ground for a railway. Suppose the banks were high enough for a bridge to be made across, which would be no obstruction to the use of the land for the railway, would it not be an unreasonable construction to put on the right given by the statute to say that the company could forbid such crossing? The case of Connecticut & P. R. Ry. Co. v. Holton, 32 Vt. 43, has been and will probably be relied on to support the instruction; but that case was decided, so far as it affected the question of farm crossing, on a statute of that state, and it is no way in point to support the instruction asked and given in these cases. The authorities are agreed on one proposition, which is that, while the right of eminent domain gives the company the power to take what may be necessary for the making and operation of its railway, the power extends no further. Redf. Rys. 250; Giesy v. Railroad Co., 4 Ohio St. 323-325. That it was not necessary to take from the farmer the right to cross the railroad track from one part of the farm to the other is shown by the fact that, either by statute or custom, this right has always been exercised by farmers throughout the civilized world. That the company could not prohibit the owner of the farm from passing under the railroad with teams, stock, etc., there can be no doubt. Perley v. Chandler, 6 Mass. 455, 456; 2 Smith, Lead. Cas. 258, marg. pp. 212, 213; Washb. Easem. 253, marg. p. 196.

*2 The court erred in refusing to allow the jury to be conducted to the premises, and to have a view thereof. The section of the Code providing for a review by the jury is particularly applicable to such cases as these. It was inconvenient, as these cases were tried in another county, but such inconvenience should not deprive a party of such benefit.

*John S. Hopkins* and *Louis A. Myers,* for defendant in error.

In the opinion of the court below it was unnecessary for the jury to have a view of the property which was the subject of the litigation, and improper, for a reason by him known, to allow the jury to depart from the county of Jefferson, and travel fifty or sixty miles to Jackson county, to view pieces of land, the market value of which alone was in issue, and could be known only by those acquainted with the value of the lands.

Under section 84 of chapter 23 of the Laws of 1868, the railway company (plaintiff in error) obtains the perpetual use of the strip of land condemned. Under section 1 of chapter 105, Laws 1876, it is the duty of each and every railway company within this state to construct and keep in repair at each crossing of any regularly laid out public highway a good and substantial crossing; and it is not obliged to construct a crossing, only at such a place or point. Under section 1 of chapter 81 of the Laws of 1869, it is declared that when any railroad runs through any improved or fenced land, said railroad company shall make proper cattle-guards on such railroad where it enters and where it leaves such improved or fenced land; and the railroad company is not compelled to make cattle-guards between such points. The statutes of this state do not declare it to be the duty of a railroad company to fence the right of way taken and appropriated; but that it may do so cannot be questioned, and the right to do so is contemplated by section 5, c. 94, Laws 1874. Kansas Pac. R. Co. v. Mower, 16 Kan. 573; Hopkins v. Kansas Pac. R. Co., 18 Kan. 462. The statutes of the state do not declare where or when the railway company must, if ever, construct crossings for the convenience of the defendant in error. The defendant in error might choose to have them constructed now, and in places to suit his convenience, while the plaintiff in error might choose to have them constructed at some future time, and at a point convenient to itself. Who is to settle the dispute? The commissioners appointed by the court to assess the damages to the lands of the defendant in error had no authority to locate a crossing, had they attempted such a thing, or even to say that one should be constructed. The statutes give them no such authority. The provisions of the general statutes of the various states,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

giving the power to exercise the right of eminent domain, are quite similar, and the rights acquired thereby, as well as the extent of the same, would be similar under the various statutes. The statutes of Vermont are similar in this respect to the statutes of this state. Gen. St. Vt. 1870, p. 219, § 17. The section declares that three commissioners shall determine the damages which the owner of the land may have sustained, or shall be likely to sustain, by the occupation of the railway. The statute of Kansas (Gen. St. c. 23, § 84) reads that the perpetual use of the land condemned for railway purposes shall vest in the railway company, its successors and assigns. The decisions made by the supreme court of Vermont upon the provisions of said section of their statutes will be authority in these cases and in this court. In the case of Jackson v. Rutland & B. R. Co., 25 Vt. 150, the court uses this language: "It is not pretended that the taking of the land for a highway gives the public anything more than a right of way in the land. But the right of a railway company to the exclusive possession of the land taken differs very essentially from that of the public in the land taken for a common highway. The railway company must, from the very nature of its operations, for the security of its passengers, workmen, and the employment of the road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy by the former owners in any mode and for any purpose."

*3 A railway company may maintain trespass for all unlawful entries and acts upon the land taken by it for railroad purposes whenever such entries and acts interfere with the exclusive possession of such land. Connecticut & P. R. Ry. Co. v. Holton, 32 Vt. 43. Driving a team upon or across the track or strip of land condemned, except at a public highway, would be a trespass. Troy & B. R. Co. v. Potter, 42 Vt. 265. Stock straying upon the track or strip of land taken for railway purposes, where the same is not inclosed with a lawful fence, would be trespassing; but the railway company could not take any advantage of the fact of such trespass in an action brought to recover the value of the stock killed by the passing trains of the railway company. See cases before cited; also Kansas Pac. R. Co. v. Mower, 16 Kan. 573; Hopkins v. Kansas Pac. R. Co., 18 Kan. 462; U. P. R. Co. v. Rollins, 5 Kan. *167.

The plaintiff in error has purchased the strips of lands in question of the defendant in error. It must pay for them the full value of the land appropriated. It must pay for the damages to that not appropriated, irrespective of any proposed benefits to that unappropriated. Const. Kan. art. 12, § 4; North v. Moore, 8 Kan. *149; Hunt v. Smith, 9 Kan. *145; St. L., L. & D. R. R. Co. v. Wilder, 17 Kan. 246. The plaintiff in error, having paid the full value of the property taken for corporate purposes, it should be vested with the whole interest of the land. Blake v. Rich, 34 N. H. 285. The right of perpetual use requires for its enjoyment a use of the land permanent in its nature and practically exclusive. Hazen v. Boston & M. R. R., 2 Gray, 580. The legislature of Kansas has declared, to secure the safety of the many passing trains and their millions of passengers, just the places where the people (and the defendant in error) shall pass and drive teams and stock across railway grounds. Those places or crossings are at the regularly laid out public highways. Laws 1876, c. 105, §§ 1, 2.

HORTON, C. J.

The errors alleged are that the court refused to allow the jury to be conducted to and have a view of the premises appropriated for the route of the railroad, and that the jury were misdirected in a material point of law.

In regard to the first allegation of error, it is sufficient to say that the matter of viewing the premises is left by the statute to the discretion of the court. Section 277 of the Code provides:

> "Whenever, in the opinion of the court, it is proper for the jury to have a view of the property which is the subject of litigation, * * * it may order them to be conducted in a body, under the charge of an officer, to the place, which shall be shown to them by some person appointed by the court for that purpose."

*4 In this case the court did not think it necessary for the jury to view the premises; and owing to the great inconvenience attending such a view, both in regard to the long distance the jury would have been compelled to travel, and the great delay involved in the disposition of the cause in the trial court by the absence of the jury in another county, we perceive no abuse of discretion on the part of the court in this action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The direction complained of is as follows:

"Now, as to the right of the company and the plaintiff to the strip of land taken and appropriated by the company: After the strip of land is appropriated, the exclusive use of this strip vests in the company. No legal right or privilege to cross over or under it is reserved or left to the plaintiff. The company has a perfect right to fence up its road, except at public highways or public crossings. In this respect the right of the company differs materially from the rights of the public in land taken for a common highway. The railway company, the defendant, must, from the very nature of its operations, for the security of its trains, its passengers, and its employes, and its free use of its road, have the right at all times to the exclusive occupancy of the land taken, and to exclude all concurrent occupancy by the plaintiff in any mode and for any purpose."

From the record it is shown that the plaintiff testified--

"That the farm was worth twenty dollars per acre before the construction of the railroad across it, and fifteen dollars per acre after its construction. He also testified that there were two drains crossed by the road on his land,--one near the easterly entrance to the land, and one near the center of the land; that the railroad company had filled up the eastern one, and made a trestle-work over the one near the center; that the one near the center of the farm was deep enough below the railroad trestle-work for stock to pass under the road, by making a little expenditure, but that the railroad company had not prepared it for such purpose, nor given him any right of way under or over said road; that the road cut off a part of his farm from Elk creek, and left him without access to it for his stock from the main part of his farm; that he had crossed the road with his teams and hauled a part of his crop across it the present season, and stacked it on the south side of the railroad near the creek; and that the railroad company never gave him any right or privilege to cross the road under or over the road."

Other witnesses were called as to the damages, who gave their opinions,--some of them much above that of the plaintiff, and some of them much below it; and upon the testimony so given, it became a question of importance, as affecting the damages to be assessed, whether, under the appropriation made, as shown by this proceeding, the railway company had the right to the exclusive possession of the right of way appropriated, and to prevent the owner of the farm from passing under or over the said railroad with his teams or his stock.

*5 To decide the question involved it becomes necessary to determine the nature and extent of the interest which railroad companies acquire in lands obtained by condemnation proceedings, under the law of 1868 and the amendments of 1870. Section 84, c. 23, Laws 1868, provides that the perpetual use of the land condemned shall vest in the railroad company to which it is appropriated for the use of the railroad. The law of 1864 provided that a title in fee-simple might be acquired by railroad companies by virtue of their compulsory powers in taking land. Under the law of 1868 a mere easement only is granted; under the old law of 1864, an absolute title could be secured. Some reason must have existed in the minds of the law-makers for the change which has been made in the statute; and we have no right to extend by judicial construction an easement into an absolute title. There is a wide difference between the two. Under an absolute title in fee-simple, the owner of the soil owns from the center of the earth up to the sky. An easement merely gives to a railroad company a right of way in the land; that is, the right to use the land for its purposes. This includes the right to employ the land taken for the purposes of constructing, maintaining, and operating a railroad thereon. Under this right, the company has the free and perfect use of the surface of the land, so far as necessary for all its purposes, and the right to use as much above and below the surface as may be needed. This would include the right to tunnel the land, to cut embankments, to grade and make roadbeds, to operate and maintain a railroad with one or more lines of track, with proper stations, depots, turn-outs, and all other appurtenances of a railroad. The former proprietor of the soil still retains the fee of the land and his right to the land for every purpose not incompatible with the rights of the railroad company. Upon the discontinuance or abandonment of the right of way, the entire and exclusive property and right of enjoyment revest in the proprietor of the soil. After the condemnation and payment of damages, the soil and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

freehold belong to the owner of the land, subject to the easement or incumbrance, and such land-owner has the right to the use of the condemned property, provided such use does not interfere with the use of the property for railroad purposes. In some cases, the right of the owner of the soil would practically not amount to anything, because the purposes of a railroad company might require the use of all the land taken to such a degree as to forbid the owner from any benefit whatever. The paramount right is with the railroad company, and the land-owner can do nothing which will interfere with the safety of its road, appurtenances, trains, passengers, or workmen.

With these views of the interest which railroad companies acquire in lands obtained by condemnation proceedings, it is evident that the court erred in instructing the jury that "no legal right or privilege to cross over or under [[the railroad] is reserved or left to the plaintiff," [defendant in error.] Under this instruction, the land-owner could not erect a suspension bridge over the road, or float in a baloon over it in the air; or even dig coal, or mine minerals, or quarry rock, in the bowels of the earth beneath the road-bed. The law is otherwise. After the strip of land was appropriated to the plaintiff in error, the perpetual use of the land vested in the railway company, its successors and assigns, for railroad purposes. The defendant in error had no legal right or privilege to cross over or under the road so as to interfere with the use of the property for those purposes. The company had a perfect right to fence up its road, except at public highways or public crossings. In the use of the land, the railroad company had the paramount right; but the defendant in error had also the right to the land for every purpose not incompatible with the rights of the road. If the railroad company required exclusive occupancy of the land taken for the use of its railroad on account of the nature of its operations, or for the security of its trains, its passengers, or its employes, it was entitled to such occupancy. On the other hand, if the company had built its bridges and trestle-work so high in places as to allow the free passage of stock or teams under the road, and their entry and passage were of no detriment to the railroad, and in no way interfered with the use of the land for the purposes of the railroad, the defendant in error, as the land-owner, had the right to enter upon such land, and pass under such bridges or trestle-work with his teams and stock without being a trespasser. He had also the right to widen the drain or passage under the trestle-work, if this in no way interfered with the rights of the railway company. The trial court followed the authority of Jackson v. Railroad Co., 25 Vt. 150; but that is an exceptional case. It goes too far. It transfers an easement into an absolute title. It announces as a matter of law that a railroad company has the right at all times to the exclusive occupancy of the land condemned for its purposes, and excludes all concurrent occupancy by the land-owner in any mode or for any purposes. We are unwilling to approve that doctrine. It is our opinion that it is a question of fact, not of law, whether the necessities of the railroad demand exclusive occupancy for its purposes, and what use of the property by the owner is a detriment to, or interference with, the rights of the road. Again, this authority is in conflict with the majority of cases, and, if adopted as the law in this state, now so sparsely settled, and where in many of the frontier counties but a single track is necessary, and public highways and public crossings are at great distances from each other, would work severe hardship and injustice. Blake v. Rich, 34 N. H. 282; Washb. Easem. 159, 214; Lance's Appeal, 55 Pa. St. 16; Evans v. Haefner, 29 Mo. 141; Railroad Co. v. Burkett, 42 Ala. 83; 1 Redf. Rys. 247; Railroad Co. v. Kip, 46 N. Y. 546; Cemetery v. Railroad Co., 68 N. Y. 591.

*6 The direction to the jury by the court below, inconsistent with this opinion, being erroneous, the judgment is reversed, and the cause remanded for new trial.

VALENTINE, J., concurring. BREWER, J., not sitting.

22 Kan. 285, 1879 WL 836 (Kan.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

EXHIBIT
tabbies'
P



**C**

Supreme Court of Kansas.
BOARD OF COM'RS OF SHAWNEE CO.
v.
A. C. BECKWITH.

January Term, 1873.

West Headnotes

**Eminent Domain 103**
148k103
A landowner, who is compelled by the establishment of a public highway over his land to build a new fence entirely across it in order to use his land as formerly, is entitled to full compensation for building such new fence.

**Eminent Domain 133**
148k133
One whose lands are taken for a public road is not entitled as damages to receive full compensation for the value of a hedge within the limits of the road, if it would be of any value to him if he were to remove it, but only to compensation for the cost of its removal and for any depreciation in value caused thereby.

**Eminent Domain 317(2)**
148k317(2)
By the laying out and establishing of a road or highway, the public acquires only an easement. The fee of the land remains in the original owner.

**Highways 80**
200k80
The laying out of a highway gives to the public a mere right of passage; and the owner of the soil is not thereby devested of his title to the land.

*1 Error from Shawnee district court.

Beckwith was the owner of a quarter section of land in Shawnee county, which he occupied and cultivated as a farm. The land adjoining on the west was also cultivated as a farm. Both farms were inclosed; the fences on the north and south lines, respectively, connecting at the division line. The partition fence was an Osage orange hedge, the south 80 rods of which was owned by Beckwith, and the north 80 rods by one Stanley. Beckwith also had 32 rods of hedge on the south line of his farm. The plaintiff in error established a public highway along the entire length of the west line of Beckwith's farm, 50 feet wide; one-half being taken from Beckwith's farm, and the other half from Stanley's. Also the highway was established 64 rods on the south line of Beckwith's farm. Beckwith claimed damages of the county by reason of the establishment of this road. The board of commissioners refused to allow his claim, and from this refusal he appealed to the district court. Beckwith claimed three items of damages. The case was tried at the December term, 1871, and the court awarded Beckwith damages as follows: For value of land taken, $70; for value of hedge destroyed, $72; for expense of fencing, $321; making a total of $463. The court also found the accruing benefits to Beckwith's land by reason of the establishment of the roads to be $142, and gave judgment for Beckwith for $321.

*Thomas Ryan,* Co. Atty., for plaintiff in error.

What is the rule of damages, so far as the matter of fencing is concerned? The district court held that Beckwith was entitled to compensation for a fence the entire distance,--the whole 160 rods,--and in this it is submitted the court erred. He was only entitled to compensation for the additional fence he would have to build by reason of the location of the road. In the absence of any road there, he was in law bound to build one-half (80 rods) of that partition fence. Fence Law, c. 40, Gen. St. p. 488, §§ 8-20. It is evident that he had agreed with Stanley to construct and maintain half of such partition fence, for both he and Stanley were growing a hedge fence, the share of each being set off, accepted, and cultivated. Yet the law laid down by the court below entitled Beckwith to recover the value of his land, the *full value* of his 80 rods of hedge fence, and the cost of building, not only the additional fence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(80 rods) imposed upon him by such road, but also the 80 roads which he was bound to and of necessity must build in the absence of any road whatever. Here he not only gets his actual damages, to-wit, the value of his land, the value of his hedge, and the cost of the additional fence imposed by the road, but also the cost of building 80 rods of other fence for which the road is no more responsible than it is for the fence on the east side of his farm. This is clearly error; and when every aggrieved land-owner in the county is insisting that the plaintiff in error shall march to this same kind of music, it becomes important that the error be corrected.

*Martin, Burns & Case,* for defendant in error.

*2 That Beckwith is entitled to the value of the land appropriated, is not an open question. That the expense of building and maintaining additional fencing, rendered necessary by the establishment of the road, is a proper item to be considered in assessing his damages, is, we think, equally as well settled. See Winona & St. P. R. Co. v. Denman, 10 Minn. 267, (Gil. 208;) Robbins v. Milwaukee & H. R. Co. 6 Wis. 636.

The remaining question is, can the defendant in error recover the value of his hedge destroyed? We say that he can. That the public may appropriate the land of defendant in error for a public highway, we do not question; but, in so doing, the public must pay him for the land appropriated, and such incidental damages as naturally flow from the establishment of the road. Taking this as the true rule, how stands this case? Beckwith was a farmer. His whole farm was inclosed, and he had the same under cultivation. There was a partition hedge of Osage orange between his farm and Stanley's. Beckwith also had 32 rods of hedge on the south line of his farm. On this condition of affairs a highway is established on the line between Stanley and himself. Now, what results from the establishment of this road? He is deprived of a portion of his land, 112 rods of hedge is destroyed, and, in order to reinclose his farm, he is compelled to build 224 rods of fence on his own land. These are the additional burdens imposed upon him, in consequence of the establishment of the road. But it is insisted that Beckwith is getting pay for 80 rods of fence that the road is not responsible for. We do not so understand it. This 80 rods is destroyed, and utterly lost to Beckwith. It is, however, insisted that he might have transplanted the hedge, and thus saved it. The plain answer to this proposition is that the law does not demand any such act. He is not required to assume the risk and hazard of transplanting this hedge any more than he would be required to remove fruit trees, or to tear down and remove a stone house, had one been standing inside the line of the road. For all legal purposes this hedge was attached to and substantially formed a part of the land. If the public propose to take the land, they must also take and pay for what is found on it. Dill. Corp. 475, note. We submit that sections 8-20, c. 40, Gen. St. 488, have nothing to do with the case. It is true that Beckwith was only bound by law to maintain one-half of the partition fence under certain circumstances, but he was not bound to maintain any part of it unless he availed himself of the use of it. But the action of the plaintiff in error has rendered it impossible for Beckwith to maintain a partition fence; and, having destroyed both his hedge and his right to maintain it, plaintiff in error now insists that he ought not to be paid for it.

VALENTINE, J.

This action was prosecuted by A. C. Beckwith, as plaintiff, against Shawnee county, for damages claimed to have resulted from the establishment of a certain public road or highway across the plaintiff's land. The road was located on the west line of plaintiff's land, (one-half being located on the plaintiff's land, and the other half on an adjoining proprietor's land;) the west line of the plaintiff's land running through the middle of the road from the north side of the land to the south side. The plaintiff claimed a judgment for the full value of the land taken, the full value of some hedge that was growing on the west line of his land which came within the road, and for the entire cost of building a new fence across his land along the line of the road as laid out. The case was tried by the court, without a jury. On the trial the county offered to prove that the said hedge could be removed without any material injury to it, and that the cost of the removal would be greatly less than the value of the hedge. The plaintiff objected to the evidence; the court sustained the objection, and the defendant excepted. The court afterwards found upon the evidence in favor of the plaintiff, and rendered

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

judgment for him for the full value of the land taken, for the full value of the hedge, and for the entire cost of building said new fence, deducting from the aggregate of said sums the amount of the benefits which accrued to the plaintiff by reason of the establishment of said road. The only question involved in this case is, what damages had the plaintiff a right to recover? We suppose it will be admitted that he had a right to recover full compensation for all direct losses or damages which he sustained by reason of the establishment of said road, minus all direct gains or benefits. Then what were his damages? We suppose it is fundamental that no man can be divested of his land, or any part or portion thereof, or any interest therein, through the exercise of the power of eminent domain, (or in fact through the exercise of any other power,) except under the provisions of express and positive constitutional or statutory law, and that he cannot be divested through the exercise of such power of any more or greater interest in his land than the constitution or statutes expressly provide for. In this state the statutes provide for the establishment of public roads and highways, (Gen. St. 897, c. 89;) but both the constitution and the statutes are silent as to how much of the land, or what interest therein, shall pass to the public, and how much of the land, or what interest therein, shall remain with the original proprietor. Therefore we would infer that nothing connected with the land passes to the public, except what is actually necessary to make the road a good and sufficient thoroughfare for the public. The public obtains a mere easement to the land. It obtains only so much of the land, soil, trees, etc., as is necessary to make a good road. It obtains the right for persons to pass and repass, and to use the road as a public highway only, and nothing more. Caulkins v. Mathews, 5 Kan. *199, *200, and cases there cited. The fee in the land never passes to the public, but always continues to belong to the original owner. He continues to own the trees, the grass, the hedges, the fences, the buildings, the mines, quarries, springs, water-courses, in fact everything connected with the land over which the road is laid out, which is not necessary for the public use as a highway. Ang. Highw. c. 7, §§ 301-312, and cases there cited. He may remove all these things from the road, or use and enjoy them in any other manner he may choose, so long as he does not interfere with the use of the road as a public highway. No other person has any such rights. In fact, the original owner has as complete and absolute dominion over his land, and over everything connected therewith, after the road is laid out upon it as he had before, except only the easement of the public therein. In the present case there is no claim or even pretense that the said hedge was needed for the road. The plaintiff therefore had absolute control over it. It was his. If it was worth anything standing in the road, if it was worth anything for removal, if it would cost less to remove and transplant it than it would be worth after its removal, then the plaintiff should not have received full compensation for its value. He should merely have received compensation for the cost of its removal to the place where needed, and for any depreciation in value caused by such removal. With these views we are of the opinion that the court below erred in excluding said evidence. We perceive no other errors.

*3 If it was necessary for the plaintiff to build a new fence entirely across his land in order to use his land as he had previously done, then full compensation should have been allowed in estimating his damages; and with the record brought to this court we cannot say that such a fence was not necessary. If the hedge could have been removed to the place where he wanted the fence, so as to make a good fence, then he should have removed it; and then it would not have been necessary for him to build a new fence entirely across his land. The hedge would have been sufficient as a part of such fence. Our statutes do not compel adjoining proprietors of land to build partition fences where the parties otherwise agree. Gen. St. 488, c. 40, § 8. And if a public road should be laid out on the line between such adjoining proprietors, each would be entitled to have the cost of all additional fences which he would be required to build, in order that he might use his land as he had previously done, considered in estimating the amount of his damages.

The judgment of the court below is reversed, and cause remanded for a new trial.

(All the justices concurring.)

10 Kan. 603, 1873 WL 699 (Kan.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.